# FEDERAL PUBLIC DEFENDER

DISTRICT OF NEW JERSEY

K. ANTHONY THOMAS, FEDERAL PUBLIC DEFENDER

1002 BROAD STREET • NEWARK, NEW JERSEY 07102 • (973) 645-6347

June 1, 2026

Honorable Stacey D. Adams
United States Magistrate Judge
Frank R. Lautenberg Post Office and Courthouse
2 Federal Square
Newark, New Jersey 07101

**RE: United States v. Milo Sedarat
25-11261 (AME)**

Dear Judge Adams,

Milo Sedarat is a 21-year-old U.S. citizen with no criminal history, no history of violent conduct, and strong and supportive family relationships. He was a junior in college, and an avid coder, who had successfully launched a software development company. Like many teenagers, Milo spent much of his time online, scrolling TikTok and Instagram to connect with friends and to view content from around the world. Unfortunately, following the horrific events on October 7th and as the subsequent violence in Palestine escalated, Milo spiraled. At first, his social media algorithms pumped videos of gory war crimes, but soon enough, he was being fed antisemitic content and ISIS propaganda videos. He followed various accounts online and channeled his frustration into social media chats of what he believed to be like minded individuals around the world. Individuals who he thought, like him, were struggling with the growing violence in Palestine and the Middle East. In the process, Milo made mistakes. He said abhorrent things to the people he connected with online and fantasized about what it would mean to take action. His community consisted of other misguided boys, his age or younger, who had similarly been radicalized online. At no point, did Milo ever launch an attack against any specific person or place; communicate with operatives of any foreign terrorist organization; or purchase a ticket to travel to the Middle East. The worst he did was provide money to one friend to purchase a ticket to fly to Turkey. The remainder of Milo's actions stayed online—he talked big, reprehensible talk online that he now understands was completely unacceptable.

On November 5, 2025, Milo Sedarat had his initial appearance before Magistrate Judge Espinosa for a criminal complaint charging him with two counts of

transmitting threats in interstate and foreign commerce in violation of 18 U.S.C. § 875(c). He consented to detention without prejudice at that hearing. Mr. Sedarat, just 21 years old and never having been incarcerated before, has now spent seven months in Essex County Jail. For all those months, he has been incarcerated under 24/7 lockdown in the Segregated Housing Unit, which means he has no company, and is only let out an hour a day (if lucky) to take care of his basic needs. Mr. Sedarat, through counsel, writes to this Court now to request that he be granted pretrial release pending the resolution of this matter.

The details of Mr. Sedarat's proposed release package are as strict as possible: twenty-four-hour home confinement with location monitoring and a live-in third-party custodian. The proposed address is his home in Montclair, New Jersey, where his parents and younger brother reside. The proposed third-party custodians are his mother, Janette Afsharian (primary), and his father Roger Sedarat (secondary). In addition to all standard conditions, and any additional conditions imposed by the Court and recommended by Pretrial Services, defense also proposes that Mr. Sedarat be subject to the following special conditions:

- Mr. Sedarat may not knowingly have contact with individuals or organizations that are affiliated with foreign terrorist organizations, or individuals or groups that promote violence for the purpose of effecting political change.

- Mr. Sedarat will not be allowed to use any social media.

- Mr. Sedarat may only have access to one Internet-enabled computer, which will be monitored by Pretrial Services.

It is counsel's understanding that the Government opposes Mr. Sedarat's release under the above conditions. Nonetheless, for the reasons set forth below, Mr. Sedarat respectfully submits that he is entitled to be released under the strict conditions proposed as a matter of law.

## I. Background

### a. The Complaint

Mr. Sedarat was charged by criminal complaint with two counts of transmitting threats in interstate and foreign commerce in violation of 18 U.S.C. § 875(c). The charges carry a maximum sentence of five years in prison and three years of supervised release each.

The basis of the charges is that Mr. Sedarat sent a series of hateful, antisemitic, and violent messages via direct message on social media to his friend[1], some of which referenced killing Jewish people and Israelis. *See generally* Complaint. Mr. Sedarat never posted the messages publicly, nor did he message any Jewish or Israeli people directly.  Mr. Sedarat also took no steps to harm any individual.

Both threats counts are set to be dismissed pursuant to a plea agreement that Mr. Sedarat has reached with the Government.

### b. The Pending Plea Agreement

Mr. Sedarat is set to plead guilty to one count of concealment of material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339C(c)(2)(A).  The basis of the charge is that Mr. Sedarat was part of a group of young men, two of whom are also charged in Crim. No. 25-11260 (AME), who participated in group chats wherein they expressed support for the Islamic State of Iraq and al Sham (ISIS) and made plans to go join the terrorist group.  The two individuals charged, alongside a few other international group chat members, purchased tickets to travel to Turkey whereinafter they planned to cross the border to join ISIS.  The two individuals were arrested at the airport and never left the United States.  Mr. Sedarat <u>never</u> purchased a ticket or tried to do so, and never made concrete plans to join ISIS.  He did, however, provide some money to one of his friends to purchase a flight ticket, and he also deleted data from his electronic devices related to the group conversations and the transfer of funds once he became concerned that law enforcement would approach him.

## II. Legal Standard

### a. The Bail Reform Act Strongly Favors Pretrial Release.

Under the Bail Reform Act of 1984 ("BRA"), pretrial detention is only appropriate if a Judge finds (1) by a preponderance of the evidence, that no conditions of pretrial release can reasonably assure the appearance of the defendant at trial; or (2) by clear and convincing evidence, that no conditions of pretrial release can reasonably assure the safety of the community while the case is pending.  18 U.S.C. § 3142(e)(1); *United States v. Himler*, 797 F.2d 156, 160–61 (3d Cir. 1986).  The "preponderance of the evidence" standard requires the government to prove that, no

---

[1] The friend is Thomas-Kaan Jimenez-Guzel, who is currently charged with one count of conspiracy to provide material support to a designated foreign terrorist organization and one count of attempt to do the same, both counts in violation of 18 U.S.C. § 2339B(a)(1).

matter what conditions of release are imposed by the Court, *it is more likely than not that a defendant will flee. See Reeves v. Fayette SCI*, 897 F.3d 154, 160 (3d Cir. 2018) (emphasis added). And, the "clear and convincing evidence" standard requires the government to prove that, no matter what conditions of release are imposed, it is "*highly probable*" that a defendant will violate the safety of the community. *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (emphasis added).

Detention without trial is a "carefully limited exception" to the "norm" of liberty under the Fifth Amendment's Due Process Clause. *United States v. Salerno*, 481 U.S. 739, 755 (1987). The BRA falls within that carefully limited exception if its provisions are followed. *Id.* Because courts can "set whatever restrictions on release [that] are necessary" to reasonably assure the appearance of a defendant and the safety of the community, "bail should be denied under the Bail Reform Act *only as a matter of last resort.*" *Gov't of Virgin Islands v. Leycock*, 678 F.2d 467, 469 (3d Cir. 1982) (emphasis added). "The structure of the [BRA] mandates every form of release should be considered before detention may be imposed." *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985). The BRA only requires "conditions that will 'reasonably' assure appearance [and safety], not guarantee [them]." *United States v. Xulam*, 84 F.3d 441, 444 (D.C. Cir. 1996) (per curiam); *accord Orta*, 760 F.2d at 891–92.[2]

---

[2] The rebuttable presumption—that no conditions of pretrial release will reasonably assure a defendant's appearance in court and the safety of the community—does not apply in this matter because Mr. Sedarat is still only charged with two § 875(c) charges. Although Mr. Sedarat acknowledges that the presumption would apply if he were charged with the § 2339C(c)(2)(A) charge that he is set to plead to, *see* 18 U.S.C. § 3142(e)(3), he maintains that the Court must apply the standard for the charges he is currently facing, not those he may face in the future.

Moreover, even if Mr. Sedarat were to be facing the rebuttable presumption, he maintains that he would be entitled to release because the burden placed on defendants through the rebuttable presumption is exceedingly low. To rebut the presumption, a defendant must only "produce *some credible evidence* forming a basis for his contention that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986) (per curiam) (emphasis added). If a defendant produces such evidence, the burden returns to the Government to prove by preponderance of the evidence that no conditions will reasonably assure his appearance, and by clear and convincing evidence that no conditions will reasonably. *See United States v. Livingston*, 2016 WL 1261464, at *2 (D.N.J. Mar. 31, 2016); *see also Himler*, 797 F.2d at 160-61. Indeed, the presumption of detention is rebutted by "*[a]ny evidence* favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment

### b.  The § 3142(g) Factors.

In determining which conditions of pretrial release, if any, will reasonably assure the appearance of a defendant and the safety of the community while a case is pending, the Court must consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger that would be posed by the person's release.  § 3142(g).

## III. Application

At the outset, counsel acknowledges that the uniquely serious nature of this matter places the Court in a challenging position in assessing pretrial release.  The antisemitic communications documented in the Complaint are abhorrent and, since the publication of the Complaint, have likely incited fear among the Jewish community, and the conduct Mr. Sedarat will plead to—concealing material support of a foreign terrorist organization—is reprehensible and adverse to the interests of our nation,  Moreover, because the charges in this case implicate foreign terrorism, this matter produces more than usual public attention and fear.

Notwithstanding these acknowledgements, counsel maintains that Mr. Sedarat is entitled to release under the BRA as a matter of law based on a coalescence of several reasons including: his total lack of criminal record and otherwise stellar personal history and characteristics, his lifelong community ties to New Jersey, the strictness of the proposed package, the lack of any evidence that Mr. Sedarat attempted to act to harm anyone or participate in terrorism himself, and the fact that there are numerous cases where individuals who are charged with § 875(c) threats

---

status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (emphasis added); *see also United States v. Chagra*, 850 F. Supp. 354, 358 (W.D. Pa. 1994) (In this jurisdiction "a defendant may rebut the presumption through 'testimony by co-workers, neighbors, family, physician, friends, or associates concerning the arrestee's character, health or family situation.' " *Id.* (quoting *United States v. Suppa,* 799 F.2d 115, 120 (3d Cir.1986).

Importantly, Section 3142(e)(3) <u>never</u> shifts the burden of persuasion onto the defendant; it always remains with the Government. *Suppa*, 799 F.2d at 119; *see also United States v. Wilks*, 15 F.4th 842, 846–47 (7th Cir. 2021) (explaining that the defense bears "a light burden of production" to rebut the presumption, "but the burden of persuasion always rests with the government").

and/or more serious 2339(B) terrorism charges have been granted release in cases with much worse facts.

### a. The § 3142(g) Factors, On Aggregate, Favor Release.

#### i. *The Nature and Circumstances of the Offense Charged.*

As acknowledged prior, Mr. Sedarat understands that the nature and circumstances of the conduct charged and the conduct that he will plead guilty to are extremely serious. Mr. Sedarat betrayed the United States by concealing efforts to support a foreign terrorist organization, and his communications were hateful and have likely caused fear among the Jewish population since the Complaint was filed. Nevertheless, a closer evaluation of Mr. Sedarat's conduct in this matter demonstrates that he did not participate in any violence or intend to harm any particular individual or group of people. Therefore, this factor weighs in favor of release, albeit under strict conditions.

Taking the two 875(c) threats charges first, the Complaint makes clear that Mr. Sedarat did not seriously intend to threaten or harm any member of the Jewish community. Mr. Sedarat never communicated his hateful language or threats publicly or to any potential victims. Rather, he communicated these abhorrent messages privately to a friend, who very clearly shared his antisemitic views and did not feel threatened by the communications or take them seriously. *See e.g.* Complaint ¶ 5c. (Individual-1: "FBI HE'S JOKING"). This distinction is critical because it demonstrates that Mr. Sedarat did not have any serious intent to instill fear within or hurt any member of the Jewish community or anyone else. His lack of intent to harm anyone is bolstered by the fact that Mr. Sedarat took no steps towards acting on any of the statements included in the Complaint. To be sure, the private nature of Mr. Sedarat's communications does not render them any less abhorrent, but it does demonstrate that he does not pose a serious risk to the community for the purposes of Section 3142.

The nature of the concealment charge is also serious but not violent. Mr. Sedarat concealed the plans of individuals to fly internationally to try to join a foreign terrorist organization, and he concealed the fact that he contributed some money to help one of them get a flight. His actions included trying to clear evidence from his electronic devices in his possession and advising another individual to do the same, but he did not take any actions *himself* to buy a flight, harm anyone, or participate in terrorism in any way. Thus, while the consequences of his actions undermined the safety of the community by facilitating support for a foreign terrorist organization,

his particular actions were not violent or threatening in nature and thus favor release under strict conditions, including electronic monitoring, under Section 3142.

### ii.   *The Weight of the Evidence Against the Person.*

This factor works against Mr. Sedarat because he is set to plead to the concealment charge.  However, it does not work against him regarding the threats charges for two reasons.  First, those charges are set to be dismissed by the Government.  Second, the Supreme Court and Third Circuit have made clear that a defendant may only be guilty of violating Section 875(c) if the Government can prove "beyond a reasonable doubt that the defendant transmitted a communication for the purpose of issuing a threat or with knowledge that the communication would be viewed as a threat." *United States v. Elonis*, 841 F.3d 589, 596 (3d Cir. 2016) (citing *Elonis v. United States*, 575 U.S. 723 (2015)).  As outlined above, it is highly unlikely that a jury would or even could convict Mr. Sedarat of violating 875(c) because there is no evidence to show that he had subjective intent to cause any victim to view his communications as a threat.

### iii.   *The History and Characteristics of the Person.*

This factor strongly favors Mr. Sedarat because he has a stellar personal record and lifelong ties to New Jersey.  Mr. Sedarat was born in Washington, D.C. to Janette Afsharian and Roger Sedarat.  He moved to Montclair, New Jersey, alongside his family in 2006 and has resided there since, aside from a one-year stint at the College of Charleston, in South Carolina, for his first year of college.  Mr. Sedarat returned to living at home in 2025 when he enrolled in Baruch College in Manhattan. Outside of his immediate family, several members of Mr. Sedarat's extended family live in New Jersey and New York including his maternal and paternal uncles and aunts, and nearly all of his friends live in the state as well.  Overall, Mr. Sedarat's strong ties to the district of New Jersey, paired with location-monitoring and third-party custodian supervision, mitigate any concerns that he will pose a risk of flight.

Mr. Sedarat's history and characteristics also demonstrate that he will not pose a risk to the community.  Mr. Sedarat has no history of violence, no history of drug addiction, or criminal activity.  Aside from the alleged conduct in this matter, Mr. Sedarat has spent the whole of his young life doing things right.  He completed elementary and high school and was enrolled in university, participated in extra-curricular activities, built relationships with his community, and worked numerous jobs including at a law office and restaurant, before becoming a freelance software developer.  The circumstances of Mr. Sedarat's family—all of whom will be keeping their eyes on him due to the charges—also suggest that he will be able to abide by the

conditions of his pretrial release. His parents are both law-abiding citizens—his father is a professor at the City University of New York and his mother owns a web design agency—and he will live with them. And because his mother does not need to leave the house for work she will be able to supervise him for most hours of the day, while his father will be available to be at home on those occasions when his mother has to leave. Critically, since this incident occurred, his parents have become acutely attuned to the dangers of online radicalization, and they are committed to monitoring any of Mr. Sedarat's online activities alongside Pretrial. Cumulatively, the combination of Mr. Sedarat's stellar past and reliable parents, and the strict proposed conditions, mitigate any concerns that he will pose a risk to the safety of the community.

> iv. *The Nature and Seriousness of the Danger that Would be Posed by the Person's Release.*

Despite the seriousness of the offense conduct, Mr. Sedarat will not pose a risk to the community if he is released. None of his actions in this case were violent, nor did he make any attempt to complete any act of violence. His history demonstrates that he does not pose a danger to anyone. And his conduct here—making reprehensible statements online and lending money to a friend—demonstrates the same.

Strict conditions would also not enable Mr. Sedarat to harm anyone. If released, Mr. Sedarat will be unable to leave his house, will be under the constant surveillance of one or both of his law-abiding parents, will be unable to so much as turn on a computer or phone without Pretrial knowing exactly what he is up to, will be prevented from accessing the social media mediums that contributed to his radicalization, and will be prohibited from communicating with anyone involved with terrorism. If he transgresses any of these conditions even minorly, this Court will be notified and penalize him accordingly. It is difficult to imagine how Mr. Sedarat could pose a risk to anyone under such strict conditions.

### b. Comparable Caselaw Supports Release in this Matter.

Although Mr. Sedarat's charges are serious, neither the charges in the complaint nor the charges he will ultimately plead to are sufficient to warrant detention. Otherwise, all defendants charged with threats or material support would be subject to per se detention—which of course is not the case. *Cf. United States v. Cirillo*, 149 F. App'x 40, 43 (2d Cir. 2005) (noting that even for organized crime leaders, there is "no per se rule requiring . . . detention").

To begin with, numerous defendants charged with making more specific and imminent threats in public forums or directly to victims have been released. For example:

- In *United States v. Radulovic*, No. 18-cr-10172 (D. Mass.), the defendant, who posted online that he was "going to bring a Remington 700 and start shooting Alt-right guys" at a rally, was granted pretrial release.

- In *United States v. Ziobrowski*, No. 18-cr-10250 (D. Mass.), the defendant was granted pretrial release after being charged with posting online that he would pay someone to kill an ICE agent and that he wanted to slit Sen. John McCain's throat.

- In *United States v. Segui*, No. 19-cr-188 (E.D.N.Y.), the defendant was charged with sending email to another person saying he did not "deserve life" and threatening to tie him down and cut off his fingers. Although the defendant even *purchased an axe* with the intention of committing murder, the court granted pretrial release. *Id.*

- In *United States v. Miller*, 21-cr-61 (W.D. Pa.), the defendant, charged with calling the offices of U.S. Representative Kathleen Clark and U.S. Senator Richard Burr and threatening to "tak[e] out" Rep. Clark and "put a bullet in" Sen. Burr's head, was granted pretrial release.

- In *United States v. Turk*, 18-cr-223 (E.D. Pa.), the defendant, charged with making several threatening statements to assault his coworkers—and who sought information on how to make explosives and had 19 firearms in his home— was granted pretrial release.[3]

---

[3] *See also United States v. Pinto*, 17-cr-68 (M.D. Fla.) (defendant, charged with leaving voicemail for congressman threatening to kill him and ending with warning to "be careful," granted pretrial release); *United States v. Henry*, 15-cr-20930 (S.D. Fla.) (defendant, charged with posting online that he would rob Citibank and shoot the teller, was granted pretrial release);*United States v. Beasley*, 14-cr-180 (S.D. Tex.) (defendant, charged with saying "You will die n*****r you and the rest of you roaches" and "I will kill you n*****r very slowly," granted pretrial release; later acquitted); *United States v. Wallace*, 22-cr-119 (D.N.J.) (Cecchi, J.) (defendant, charged with sending multiple emails to another person threatening "blood everywhere" and person's family being "shattered," granted pretrial release); *United States v. McGuire*, 22-cr-1395 (S.D. Cal.) (defendant, charged with leaving voicemail for Senator Charles Schumer saying, "I'll blow your f***ing head off you f***ing Jew f****t," and with

Moreover, many defendants charged with terrorism offenses, including more serious 2339B charges and offenses involving violent conduct, have been released. Several of those defendants remained released even after entering guilty pleas. For example:

- In *United States v. Kyse Abushanab*, 25 Cr. 137 (KSH) (D.N.J.), with the consent of the government, Judge Hayden released a defendant charged with providing material support to ISIS on a $100,000 unsecured bond. Mr. Abushanab was alleged to have used encrypted messaging platforms to gather and distribute training materials on the making and use of explosives to ISIS supporters. Mr. Abushanab has remained on release, *even following his guilty plea*, without incident.

- In *United States v. Halimi Salman*, 24 Cr. 206 (NCM) (E.D.N.Y.), over strong opposition from the government, Judge Natasha C. Merle reversed the detention order imposed by the Magistrate Judge and released Ms. Salman, who was alleged to have received military-style training in Syria from ISIS, in violation of 18 U.S.C. § 2339D, from custody to home incarceration enforced by a $500,000 personal recognizance bond co-signed by eleven suretors (only one of whom was financially responsible), secured by a home with $141,000 in collateral, and with similar special conditions to those proposed in this case. Ms. Salman, who was *taken to ISIS-controlled territory* by her father when she was a minor, *married an ISIS-fighter,* and allegedly *underwent military training* in how to fire an AK-47.

- In *United States v. Hashimi et al.*, 22 Cr. 553 (ENV) (E.D.N.Y.), the defendants were charged with conspiracy to provide material support to a foreign terrorist organization, attempted material support, and money laundering, in violation of 18 U.S.C. § 2339B and § 1956(h). The defendants were accused of attempting to send tens of thousands of dollars to ISIS, using encrypted chats and cryptocurrency to avoid detection, consuming and disseminating ISIS propaganda, expressing support for violent acts of terrorism, and, in the case of two of the defendants, *planning to visit an accused terrorist at Rikers Island*. At the initial appearance, Chief Magistrate Judge Pollak released defendant

---

documented history of leaving "numerous threats" to other members of Congress and even a U.S. Capitol Police Officer, granted pretrial release); *United States v. Adams*, 22-cr-130 (E.D. La.) (defendant, charged with threatening fifth-grade students and teachers, "I'm gonna hang you by the tree you dirty n****rs," granted pretrial release).

Seema Rahman on a $500,000 bond with two suretors, secured by two real properties, and denied release as to defendant Abdullah At Taqi. Mr. At Taqi renewed his bail application before Magistrate Judge Merkl, which was again denied. Mr. At Taqi appealed the decision of the magistrate judge and on April 28, 2023, Judge Vitaliano granted the application over the government's objection. The two released defendants have not had any compliance issues. Mr. At Taqi was recently convicted of all counts after trial and *continued on bail pending sentencing.*

- In *United States v. Shahidul Gaffar and Nabila Khan,* 20 Cr. 392 (JDW) (E.D. Pa.), a husband and wife were charged with providing material support to ISIS by sending money to relatives to permit them to join ISIS in Syria. They were released by Judge Wolson on unsecured $100,000 bonds to home confinement with electronic monitoring. They remained out on bail *pending sentencing* without issues.

- In *United States v. Delowar Hossain*, 19 Cr. 606 (SHS) (S.D.N.Y.), Judge Sidney H. Stein released Mr. Hossain from custody to home incarceration enforced by a $250,000 personal recognizance bond co-signed by five financially responsible persons. Mr. Hossain was accused of attempting to provide material support for an act of terrorism (the attempted murder of U.S. nationals overseas) in violation of 18 U.S.C. § 2339A and attempting to provide material support to a specially designated global terrorist organization in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705(a). Specifically, the government accused Mr. Hossain of trying to recruit several young men into a scheme to travel to Afghanistan and join the Taliban. Mr. Hossain initially discussed attacking a particular army recruiting office in the Bronx on behalf of Al Qaeda. Later, he resolved to move to Afghanistan to fight against Americans. Over several months, Mr. Hossain prepared for the trip by declaring himself the "emir" (leader) of his group, and *buying various items to use on the journey and give to the Taliban.* The items included walkie-talkies, camping gear, hatchets, tents, and other outdoor materials to help the group navigate the tough Afghan terrain. Hossain also *saved $10,000 to purchase weapons, and was in contact with actual Taliban members.* Hossain took various steps to hide his plans from authorities, including requiring that his group meet in person, which forced the FBI to hide microphones on the confidential sources to obtain the communications. Mr. Hossain was ultimately arrested at the airport before he could board a flight to Thailand, the first stop on his trip to join the Taliban. Mr. Hossain faced a maximum punishment of 35 years' imprisonment and sentencing guidelines at

the statutory maximum. Over the government's objections, Judge Stein released Mr. Hossain to home incarceration. Judge Stein found that the government had not met its burden as to dangerousness given Hossain's lack of a criminal record and because his alleged conduct was focused entirely overseas. Judge Stein further rejected the government's argument that Hossain posed an insurmountable risk of flight. Mr. Hossain remained on bail for nearly 16 months without a single violation, and was remanded following a guilty verdict at trial.

- In *United States v. Kim Anh Vo*, 19 Cr. 223 (NRB) (S.D.N.Y.), Judge Naomi R. Buchwald released the defendant on a consent bail package, the conditions of which included participation in a program aimed at countering extremism. Ms. Vo was charged with conspiring to provide material support to ISIS in violation of 18 U.S.C. § 2339B. Specifically, Vo *worked as a member of the United Cyber Caliphate* ("UCC"), which was committed to carrying out online attacks and cyber intrusions against Americans on behalf of ISIS, and recruiting others to expand UCC's capabilities. Vo attempted to disseminate violent ISIS propaganda threatening that "there will be blood today, tomorrow, and until your last breath" and recruited at least one minor to create content for the UCC, including a video and related posts of death threats targeting a nonprofit organization (dedicated to combating online extremism) in Manhattan as well as its leader. The threatening posts contained photographs of the CEO of the organization (a former U.S. ambassador) along with a video of an individual in shackles with his throat slit and bleeding. Vo *pledged allegiance* to Abu Bakr Al-Baghdadi, then the leader of ISIS. After the March 2017 terrorist attack outside the British Parliament building in London, Vo discussed using the success of the attack in creating new ISIS messaging and propaganda. On April 2, 2017, UCC posted online a kill list containing the names and personal identifying information of over 8,000 individuals along with a threatening video, promising to wage war, and a second video depicting a beheading. Ms. Vo continued her efforts on behalf of UCC and ISIS even after learning she was under FBI scrutiny. Ms. Vo ultimately pled guilty to the lesser offense of conspiring to provide material support, in violation of 18 U.S.C. § 371, with a five-year statutory maximum sentence. She was sentenced to time served.

- In *United States v. Colin Mattis and Urooj Rahman*, 20 Cr. 203 (BMC) (E.D.N.Y.), two young lawyers were *caught on video firebombing a police car* during a Black Lives Matter protest. They were charged with arson and the use of explosives, charges which carried a 30-year mandatory minimum sentence. The government argued that their actions showed that they posed a danger to the community that no conditions of release could ameliorate. The

Magistrate Judge, affirmed by the District Court and ultimately the Court of Appeals, found that the danger posed by their conduct, while extremely serious, did not mean that the presumption could not be rebutted, given their lack of any history of violence, no criminal record, strong family ties and public service careers. Both defendants were on pretrial release for nearly two years with no violations.

The following language from the Second Circuit's affirmation of the district court's grant of release in *Mattis* is particularly instructive regarding the importance of granting release under the BRA irrespective of the seriousness of the underlying charge:

> The government's position that the district court committed clear error in granting bail essentially boils down to an argument that the charged criminal conduct is so extreme and aberrant that it represents the new normal for the defendants, such that no set of conditions could reasonably assure the safety of the community. The acts alleged were indisputably dangerous and may have posed a serious risk to individuals in the surrounding areas. As a threshold matter, however, we must observe that the entire system for determining bail is premised on the belief that, at least to some extent, all criminal acts are aberrant. The very reason that Congress directed district courts to consider factors beyond just the severity of the offense is the recognition that an individual is more than the crime of which that individual has been accused.

963 F.3d at 293.

As in *Mattis*, while there is no doubt that Mr. Sedarat's conduct was extreme and aberrant, there is a bulk of evidence indicating that Mr. Sedarat is more than the crime of which he has been accused.  Moreover, the reasoning of the Second Circuit is particularly compelling here because Mr. Sedarat's conduct in this case was far less dangerous and serious than the firebombing of a police car.  Overall, by releasing Mr. Sedarat in this matter, this Court would be acting consistently with its sister courts in this district, in this Circuit, and across the nation.

### IV. Conclusion

Mr. Sedarat is not requesting to be released on personal recognizance.  He is not asking for a curfew or home detention.  He is asking to be released on the strictest

conditions available to this Court—full-time location monitoring with a live-in third-party custodian—with several additional special conditions tailored to the unique circumstances of this matter.  There is zero evidence to suggest that Mr. Sedarat would fail to appear in Court under such strict conditions, and there is ample basis to trust that such conditions will ensure the protection of the community. Accordingly, Mr. Sedarat is entitled to pretrial release under the BRA,

Respectfully Submitted,

/s/ Areeb A. Salim
Areeb A. Salim
Assistant Federal Public Defender
Office of the Federal Public Defender
1002 Broad Street
Newark, NJ 07102
973-339-7506 (tel.)

/s/ Anita Aboagye-Agyeman
Assistant Federal Public Defender